Secretary of the Interior U.S. Sportsman Alliance Foundation Appellant State of Wisconsin Ms. Pepin for Appellant Jewell Mr. Gambo for Appellant State of Michigan Mr. Lister for Appellant Sportsman Alliance Mr. Henry for the Appellees Good morning. May it please the court. My name is Joan Pepin on behalf of the Fish and Wildlife Service. This case presents two important questions of statutory interpretation, both of which have been definitively construed by the agency charged with the implementation of the Endangered Species Act and are entitled to Chevron deference. Notwithstanding that the district court declined to defer to the agency's interpretation on both questions, we believe that was an error that we're asking the court to correct. The first question is whether the Fish and Wildlife Service may designate and delist a distinct population segment of a species that is listed at a broader level, such as at the subspecies or the species level. In Fish and Wildlife Service's view, the statute is not even ambiguous on this question. Section 4A1 of the statute, which is reproduced in the statutory and regulatory addendum at page A4, states that the secretary shall determine whether any species is an endangered species or a threatened species because of any of five listed factors. Species is defined by statute on the previous page of the addendum as any, including a full species, any subspecies, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature. I thought your argument was that you were just revising the 1978 definition. The district court ruled on both of those things. What is your chief argument here? I guess our chief argument is that the statute allows the Fish and Wildlife Service to designate a DPS within a broader listing for uplisting, downlisting, delisting, whatever is appropriate. Because it was more than a revision of the 1978 listing, wasn't it? There were some catch-all wolves that weren't included in the 1978 listing that are now covered by the DPS. The wolves that are outside of Minnesota that are included in the DPS, and this is an undisputed factual matter, derive from the Minnesota population. They are the descendants of the Minnesota population. My notes are showing the Isle Royale wolves in Michigan. They were not part of the original 1978 listing, were they? They're captured now. In 1978, they were not part of the Minnesota wolves listing, but now you're treating them as if they are not a threat. That's a good question. I guess that's correct, that they were part of the 1978 listing. That has never been considered a significant population because it is so isolated that it really hasn't even been part of the recovery plan for the Minnesota wolf population. Wait, when you say not part of the recovery plan, what about the recovery plan or the plan for the wolves that were in the rest of the state? In the western Great Lakes, which is the Minnesota population, which has now spread across several states, the northern Rocky Mountains, which is now a mostly delisted DPS, about 1,700 wolves, and in the southwest, a population of Mexican wolves, and that population is still endangered. Those recovery goals, with the exception of the southwest wolves, have at this point largely been accomplished. The only breakout originally was the Minnesota wolf population and then the rest of the country. That's how things were divided, correct? Correct. The rest of the country would have included these wolves in Isle Royale, correct? Yes. Okay, and those wolves have actually gone down to a dangerously low level. I think there's only two left? Definitely. Rather than protecting them, those two, and trying to bring them back from the brink of extinction, at least for extirpation for that group, you put them into the Minnesota group where they were first covered under the Endangered Species Act. How can that be allowed? For two reasons. First of all, Isle Royale is a national park. Those wolves are better protected than they would be under Endangered Species Regulation because they're at least as protected. There's no hunting on national parks. They're at least as protected now under this delisting, or is at least protected when they were under national parks? They continue to be a national park, and therefore they will, with or without an ESA listing as threatened or endangered or delisted, they will continue to be very highly protected. However, the other reason why that doesn't preclude delisting is the wolves of that particular island are not a species. They are not a DPS. They could never be a DPS because it's not a... They're members of the species, and the species is the non-Minnesota wolves in the U.S. that's originally listed. Okay, yes, but the Endangered Species Act doesn't preclude the loss of a pack of wolves. The Endangered Species Act is targeted at the recovery of a species, and species are defined in the act either as the whole species or a subspecies or a distinct population segment, but a distinct population segment isn't just any population. It has to be discreet, which actually the LRL wolves certainly are, but it also has to be significant, and in order to be delisted, it would also have to be viable. So you're assuring that they're not significant to the species? Yes, yes, and they are not a separate species. The population at issue here, the species at issue here is the Western Great Lakes DPS, which is a population of some 4,000 wolves, primarily centered in Minnesota, Wisconsin, and Michigan, wanders about a little bit... Am I right? You've moved the Isle Royale wolves from one category to another. In 1978 they were in one category, now they're categorized separately. Yes, that's true, and... There's a background fact here, they're in a national park, but... I'm just trying to make sure I understand what you're saying. On the one side, the fact that they're in a national park. In 1978 they were protected, now less so, right? Now they are not included in an endangered species recovery training board, yes. They are, as you noted, still fully protected by virtue of being in a national park. Would their position be the same if they weren't in a national park? I'm sorry, can you... So, revising the list, sleep in a group that the protection is not working, they're declining, so let's just sleep them in with some others? Well, again, a small little pocket of wolves is not a species, and it is possible for a species to be viable and recovered, even while a group of five or ten wolves is at risk. So your position would be the same even if they weren't being protected in this national park? Yes, the potential loss of that small pocket of wolves does not jeopardize the species. I have a similar question about the six states that form the surrounding area, the peripheral area. It's not entirely clear to me. I take your argument to be that the Minnesota wolves have thrived and expanded and that they are now, their core habitat now includes areas in Wisconsin and in Michigan. And that these other, part of these other six surrounding states have been included because they are within the ordinary range of these far-traveling mammals that they may, you know, go that far around. But why would those areas, which originally were areas of wolf population and which now I gather have little or no wolf protective regulations, be included in a delisting when it looks like from your rulemaking virtually all the wolves that have been found as having wandered in those areas have been killed? It's not clear to me why that would be part of the delisting. In order to designate a DPS for any purpose, uplisting, downlisting, because it's geographically defined, you have to give it a geographic description. And that's going to vary from species to species depending on the biological habits of that species. In the case of wolves, they then in certain locations, but they do walk around a lot and some of them, the boundaries, they considered doing a very closely drawn circle around the actual inhabited sites. They considered including everywhere wolves from this population have been known to go. And they thought it was most appropriate to consider a central pack and remain part of that population. That was the application of the agency's expertise in this case to define this DPS. There has to be a geographical definition because this is a statute that carries significant civil and criminal penalties and people need to be on notice where, you know, when they find a wolf somewhere, whether it's listed or not. I guess I'm not still clear, not understanding your answer. Why is the context of delisting, it wouldn't, the unit, the relevant unit wouldn't just be those three states where the wolves are thriving. And why one wouldn't want to be concerned about protection in areas where there's no argument that wolves have not been established. There's no wolves established in Ohio or in the other... No, there aren't. And the, you know, first of all, the portion, there's a map on page 1152. Yeah, I know that portion is tiny, a little more so though. So you're, not a few wolves having a backyard there that they might go into. That state is being delisted. It was really never the intention of the original listing and the recovery plans for wolves to be restored in those areas. There's not suitable habitat and it's, it was not a place where wolves could live. There's too much root density, there's too much human population, not enough prairie base. Those places are not good places for wolves to live. And that's why even through, you know, the last 30, 40 years of endangered species protection, wolves haven't gone there. They haven't gone into southern Minnesota because it's not good wolf habitat. I mean, it's roamed in there occasionally, but they haven't settled the way they have filled up almost all of the suitable habitat across the upper Midwest. It seems like an enormous amount of the service's statutory argument turns on the focus and the scope of the original recovery plan, which I just find it hard to sort of relate that to the statutory questions before us. I understand the logic of it, that, you know, looking at the New York Station and the wolves, the service shows these three areas to focus on for recovery and actively went about repopulating in those three areas. And now we see some resurgence of wolf populations in those three areas. But the statute talks about the species as a whole and your materials, the regulatory background going way back, shows the protection to be nationwide. And I mean, I take you into common sense terms to be saying, well, we as a scientific matter have deemed having these three populations be robust is enough. And when we succeed, we're going to be done and the whole country should be delisted. And so I take that to be your position. It's just unclear to me why everything revolves around that choice in the recovery plan. It could have chosen five areas. There certainly is more habitat. I think it's also the regulatory record demonstrates there's more habitat in Maine, let's say, or New Hampshire, you know, where wolves could also thrive, but good enough. So it's very hard for us to figure out how to administer that. Well, our statutory argument does not actually depend on the choice in 1978 to recover wolves in these three historic areas. Our statutory argument is that the statute in what we would say unambiguous terms, but I can get into the policy and legislative history reasons justifying it if you consider it ambiguous. But in unambiguous terms, allows the state to make a determination about whether any species is an endangered species or a threatened species. This DPS, species is defined to include a DPS, and so it can at any time make a determination that a population within a species is not endangered or not threatened, that it is discrete, which means markedly separate from other populations of the same taxon, and that is true in this case, and that it is significant, important. That relates to the legislative history about Congress not wanting to install squirrels in a particular city park. This is a significant population of 4,000 wolves, and that it is recovered, it is thriving, and that point is very broadly held across a wide variety of interest groups. Everything ranging from NRA to the National Wildlife Federation have agreed that this is a significant population. The statutory interpretation does not depend on the fact that they chose 3 as opposed to 5. The statutory interpretation depends just on the terms of the statute, which gives the service, the secretary, the power to make this finding in the affirmative or in the negative. And what the district court did is held that any species doesn't really mean any species. It means species, subspecies, and DPS will leave the findings in the affirmative. You see the statute did not support that reading. So I understand the proposed rule did rest in part on the notion that this was a genetically distinct species, or a zoologically distinct species, and that seems to be no longer the service's position. And again, when I'm thinking about how to relate what you're asking for today to the persistence of the rest of the nationwide original listing staying intact, it is troubling to figure out in this situation why you could have a DPS within a part of that larger listing reallocated to the Minnesota segment. I mean, maybe the right thing to do, given what you know about the genetics of these wolves, is not to treat the DPS separately, but to look again at the whole country, the whole Minnesota into the rest of the country. Well, the difficulty with that interpretation, if it were applied across the board, is it would take away from the service the flexibility it needs to respond to that, I've said this several times, by listing it at the species level across the nation, the Fish and Wildlife Service sacrificed regulatory flexibility for protection. It repeatedly stated that once you made a decision to list it at a broader level, you can only deal with it at that level. If that is true, then it's not a one-way ratchet, as the district court used it. If we can't list it nationwide as threatened, and one population is struggling, we'd be in the same situation of not being able to say, this population needs to be dealt with separately, we need to uplift this population to endanger it. Do we have instances of the service doing that? I'm sorry, Your Honor, I don't know the answer to that question. But I mean, it's certainly a situation that they ought to have the flexibility to deal with if it does arise. I think that's why she said it's a one-way ratchet, that you can't do it in that. She said both of those things. She said you can only recognize a DPS if it is endangered or threatened, which is contrary to the DPS policy itself. The service's explanation of the DPS policy, which is that Joint Appendix 1123, they explain in the rules that under the DPS policy, it's a DPS if it's discrete and significant. That makes it a DPS. Then you determine what the population status is. The flip side is, to the extent that the ESA is concerned about species viability, it would have the service ask, having defined the pertinent species, it would have the service ask, when it is interacting with states and taking measures and investing its resources, what is the status of this species as a whole, vis-a-vis available habitat and populations. We already do that, I assume, globally, when you're looking at species. So there is some powerful common sense to the notion that the lens should be a species-oriented lens. Therefore, once you've abandoned the notion that the Minnesota population is somehow zoologically distinct, why wouldn't you still look at the picture as a whole and when the service says, look, we have achieved all of the recovery plans. They do still have to do that. The statute requires the service to reevaluate things every five years. I'm talking about listed species. The service under Section 4C, which is 16 U.S.C., 1533 C, the service has an obligation to periodically and no less than every five years determine whether a species should remain on the list. So that obligation to say, how is this listing in its entirety doing, remains there. You're saying that we substitute a DPS where the service has identified a DPS. So in that case, you're going to be doing separate inquiries because you've sort of islanded off these separate populations? It can do that when appropriate. The statute specifically gives the service that flexibility by defining species to include DPSs, subspecies, and species, and by giving the secretary the authority to make a determination about any species as defined in the act. The question is, what was the purpose for giving the service that authority? Decreased protection for endangered species or decreased protection? It targets protection at endangered species. When the service doesn't have to expand its resources anymore on a population that virtually everybody agrees is recovered and is thriving, then it can focus its resources on other species, other populations that need it. As you all know, the service does not. It has to list species as warranted but precluded sometimes. I mean, the statute actually allows for the fact that the service doesn't have enough resources. And so when a policy decision forces the agency to keep species listed that are recovered, it diverts resources away from protection. It also raises public antagonism, which makes conservation more difficult. When a species becomes listed and it can effectively never become delisted because you have to wait until it's delisted in Arizona or until it's recovered in Arizona before you can recognize this thriving recovered population in the upper Midwest, that dampens public support for species recovery, which is a problem for the endangered species. What about the problem the other direction or the concern the other direction? And that is you have something that was a nationwide species originally and became endangered. And you can have this with other species as well, where rather than actually commit to bringing that nationwide species back from the brink, the very forces that have caused it to become endangered keep operating in a way to keep pushing it, that species, into isolated pockets. And rather than, you know, the differential conditions that you're flagging for a segment here are in fact the very forces of endangerment that are supposed to be combated. And when they all sort of then get corralled into little tiny corners of the U.S., little pockets of the U.S., there's at least a concern on the briefing on the other side that when you go, ah, look at those in northeast Exudate. They're all there. They've been forced there by lack of protection for habitat, lack of protection from human activities. They've been forced there. We will draw a circle around them and declare them healthy and recovered. And then we'll look over there where they've been cornered. And we will draw a circle there and call it recovered. And voila, the species is recovered. The argument on the other side and the concerns in the district court is that you're actually giving effect to the very forces you're supposed to be combating. And in doing so, you're able to delist without meeting the stringent terms of the Endangered Species Act for that species. What is your answer to that concern? That the endangered species doesn't go that far. The Endangered Species Act, sorry, doesn't go that far. It requires the conservation of species. The recovery of them to the point where they no longer require the protection of the Act, which under the Act means that they are not in danger of extinction by any of the five listed factors. The Act does not go so far as to require that endangered species be restored to every place they live before westward expansion. That is not possible. Not every place, but there are things like significant range in the statute as well. And it seems to me that you can almost evade that by the combination of the segmenting here and the definition of significant range and suddenly go, we're going to draw this circle. We'll call that its current range and declare it fine when in fact it is the very forces you're supposed to be combating that have trapped them in that little corner of the U.S. How do we know? And then you declare that recovery because that little group is okay on that little pocket. I keep having images of polar bears stuck in little ice floats somewhere and we'll go, aha, there's a successful ice float and there's a successful ice float. Let's just stop that. We could never do this, a little isolated pocket like an ice float. A large, viable, self-sufficient population. In this case, about 4,000. A large and viable is a function of the circle you've drawn. The original population was not measured in four figures. So could you draw a circle somewhere and go, here's 1,000. And it's a small area, so within 1,000, that's what 1,000, so the area will support and that's successful. In order to be viable, a population has to have representation, a good genetic base of species, resiliency and redundancy. And with a small population, and it's going to vary by species, what small is and what big is, depending on their reproductive capacity and things like that. But a population has, a very little population, the fear that isolated pockets will be delisted is not very realistic because they wouldn't be viable if they were isolated pockets. Only big, viable populations like this could be a DPS and could be considered recovered and viable going forward. Now the big question that I think you're getting at is, what is it that the endangered species is trying to combat? And what it's trying to combat is the threat of extinction. Not more. Not the restoration of the Old West. And in this case, in the case of the gray wolves, there is no longer a threat of extinction. And that is the basis for recovery. Does extinction mean, this is a question I wasn't clear on because it seems to get used differently. Does extinction mean gone completely, or we'll say for these purposes, gone completely from the United States? Or does extinction mean gone from a geographic region? Extinction means gone from the place where it's listed. So if you listed a subspecies, it would mean that subspecies is extinct. If you listed a DPS, it would mean that population is extinct. I'm sorry, so if wolves used to be, or some other creature used to be, imagine it used to be all over the United States. And then it comes to a situation where it is only located in Rhode Island, New Hampshire, Massachusetts. Those are the only places left that it's found. There's none, absolutely none anywhere else in the U.S. But there's a good healthy population in those three states. Do we call it extinct in California, Utah, Nevada? Because sometimes it's used that way as geographic extinction, and sometimes it's not. I have heard that used, yes. When you just said the whole point is to save it from extinction, does that mean save it from extinction in the U.S., or save it from extinction in this state, that state, and the other state? Or this region, that region, the other region? The language of the statute suggests a significant portion of its range. It uses the phrase extinction through all or a significant portion of its range. So why shouldn't we look at extinction as saying they're extinct in the Intermountain West? And so that's not acceptable. So it doesn't, it tells you to conserve species that exist, not necessarily, although it can reintroduce species in places where they are. Because that's what happened in the Intermountain West, right? That's right. Yeah, and that population is large enough now to be mostly delisted as well. I'm sorry, I forgot it. I'm talking about the geographic extinction and significant range. And you had started to answer. Oh, yes, thank you, significant portion of its range. So as the agency explained in the significant portion of its range rule, which is in the statutory and regulatory addendum at page A31 and following, the significant portion of its range language is in the definition of endangered species and in the definition of threatened species. And the definition of an endangered species is one that is in danger in all or a significant portion of its range. And the services, this is the National Marine Fishery Service and Fish and Wildlife Service together, this published policy, if you've noticed any comment, and interpreted that statutory language as meaning significant portion of its range refers to its current range because a species is not in danger of extinction in an unoccupied portion of its historic range. So you look at the species where it is and you ask whether it's in danger of extinction. Now, it's quite possible that by virtue of the loss of some of its historic range, it's now in too small an area to thrive or it doesn't have enough prey base or it doesn't have enough habitat. It's certainly the loss of historic range as a factual matter can impact the present prospects of that species. But if you don't... Back to where this started, imagine bison or something. They should be over the entire western United States. And if by the time they come to your... I know this is counter-historical, but imagine someone, by the time they come to the attention of the service, there's only some left in Wyoming. And we know they used to cover the entire western United States. And you go and there are 3,000 in Wyoming. Are they extinct everywhere else? That's my first question. The second is, is it consistent with the Endangered Species Act? You go, well, here this is nice, 3,000 of these in Wyoming, perfectly happy. We'll draw a circle around them. We wouldn't draw a circle. In fact, they're perfectly happy there in Wyoming. There's no endangerment. The answer to your second question is yes. The question for the agency is, is this existing population where it is now in danger of extinction? They're only there because that's the only place they're left. They've been hunted to extinction in every other pocket of the United States. And we're going to look at this. We're going to study this species and go, no need to list buffalo or bison because here's a happy group in Wyoming. Yes, because the question is, is this species in danger of extinction? That's as far as the Endangered Species Act goes. It tries to prevent extinction. I understand what the Endangered Species Act does. It seems to us this sort of narrow focus on current, as opposed to looking at both historic and current to assess what the status of the species is seems to me a bit wooden and counter to the whole purpose of the Endangered Species Act, which isn't just to go, we don't care what's happened. We're looking at these for the first time. Here they are. We're not going to pay any attention to where they normally were. Just protecting them from extinction has been a very ambitious and major goal for the agency over these last years, since 1973. And they've come a long way in recovering a lot of species. The goal you're talking about is restoring species. Are they protected from extinction at that point, or are they now not protected from extinction because they are extinct in all of the United States, in my hypothetical, except Wyoming? I'm trying to answer the statutory question. The protections of the Endangered Species Act apply to animals, not to places. And so you look at the animals, where they are, and you determine whether they are in danger of becoming extinct. If they are not in danger of becoming extinct, and it's a factual question, then they are not endangered or threatened and can't be lifted. That would be true even if they used to occupy ten times the state of Montana, Oklahoma, whatever. If you protect them, they'll have the capacity to go out and no longer be extinct in the rest of the country. And the states, which have the authority when the federal government doesn't, do have the authority to allow that to happen. These populations are going to have a lot of protection, especially in the areas of suitable habitat, if the delisting is restored. Michigan, Wisconsin, and Minnesota have very good protection, but they have no such. You mentioned the political stability of endangered species protection from the federal government, and I have a question about if I were a Maine politician in the state of Maine, which I assume has a lot of suitable habitat, but it wasn't chosen as one of the areas for the recovery plan, and if I looked at compared to, let's say, South Dakota, which is just about under your rule delisted, and think, how come that state gets delisted and my state doesn't? And it seems like there's, without having done anything different, in fact, they have no protective laws. Why? I can see why when you're looking at, on the way up, the ratcheting up, you can think about those states, because that's where the wolves roam, but precisely for the same reason, it seems like people want to be a little bit more demanding of those states. There's very little mention in the rule. Because there's very little impact on the species. The occasional lone wolf roams into South Dakota, but the overwhelming majority of the population stays in Minnesota, Wisconsin, and Michigan, and therefore, that's where all the threats that could affect the species are. What you find in South Dakota is a threat that could affect a wolf. I follow that. It's just the listing, delisting. They're not implicated enough either way, maybe, to be within the DPS. It just seems odd to refer to states as part of the DPS when they don't actually have a material wolf population, period. It's just a function of this species biology. It might be different with a different species that didn't roam around a lot, but this is part of the place where these wolves go. Super few examples in your record of any wolves. Negligible numbers wandering in those areas. Compared to the 4,000 core population, it's negligible, but it's enough. It's a function of wolves that they disperse, and many of them make their way back. I just have one question about the range, historic, present. I know that services position is that you look at current range. That can't be right when you're in a situation where, as you said, I think if the current range is so truncated because the species is under so much stress, obviously you wouldn't look at that as the relevant range, because the whole point is that they have to rebound to suitable habitat, not that population's pockets range. There's got to be some reference to both historic range. I think that goes to whether the species is viable in its current habitat. If it's not viable, then you have to say, as you said in the recovery plan, where are some other places? If it's not viable in its current range, then it should be listed. This species is viable in its current range, so that's why it was delisted. Absolutely, if a species, if you look at it in its current range, and it is in danger of extinction or becoming a threatened species, then it would be listed. You do examine it in its current range to make that determination. If that range is small, then yeah, it's probably not going to be sufficiently resilient and redundant to be delisted. I'm sorry. I'm sorry, I apologize, but just one more, because I'm trying to reconcile with something that seems as a tension in your argument to me, but I'm sure you can tell me why it's not. When it comes to explaining why you bothered to include the other six states in this segment, instead of just having a Michigan, Minnesota, Wisconsin segment, you talk about, they're wrong. The expectation is that some will go there. In fact, they have gone there, I take it. When it comes to state regulatory plans and the fact that, I think it's not all, but almost all of those six states have no regulatory plans or protections in place for these wolves when they get there. Don't worry, they never go. They never go there. That's the tension I perceive. The inquiry into state regulatory mechanisms is part of the inquiry into whether a species is threatened or endangered. Not whether a wolf or two wolves, but the whole species. What the survey found in this case is that because 95% of these wolves or more spend all of their time in Wisconsin, Michigan, and Minnesota, those are the states where protective mechanisms are important to the preservation of the species. Now, wolves do roam into these other states sometimes, but even if every wolf or woman in South Dakota were to be killed, that would not jeopardize the viability of the species, and that is the standard under the Endangered Species Act for listing, delisting, for determination of the species status. It's not that they're not there. It's just that the fate of a few isolated wanderers does not, under the facts of this case, impact the viability of the overall species. And just to be clear, your position then is if all the wolves that wandered into all six of these states died year after year, every time they wandered in, that still would not threaten the species? That's the factual finding in the record in this case, yes, which was... Well, you tend to do it state by state, and I'm trying to look for the collection. The discussion is, I know if they wander into South Dakota and those die, that's not a problem, but I want to make clear that whatever the expectation or projection is, as this population continues to grow and thrive, if everything that wanders into every one of those six states every year dies, it won't be a problem. It's probably not going to continue to grow. It's probably going to stabilize. It's occupied all the suitable habitats. It's stayed at a good high level, but it hasn't been growing, and it's probably not going to continue to grow. The growth is not necessary for its viability. This population is stable and viable the way it is, which is why the Fish and Wildlife Service, all of the state wildlife agencies, all of the peer reviewers, and even several major environmental groups agreed that it was appropriate to delist this recovered population. Great. We'll give you back a couple minutes. May it please the court, my name is Nate Gamble for the State of Michigan and the Michigan Department of Natural Resources. This court should averse the district court, because the district court's ruling pulls the rug out from under the states. By doing that, it significantly impairs the federal agency's ability to conserve endangered species. This is because in section two of the act, the phrase that the act uses is that state cooperation is a key to the success of the act. The way that states cooperate in the conservation of endangered species is that they are encouraged to develop and maintain their own conservation programs. The phrase that that section uses is that federal agencies use a system of incentives in order to encourage states to develop and maintain those conservation programs. The reason it's so important for states to cooperate and participate in the implementation of the act is that it is the states that have the resources, the facilities, the personnel to actually implement the Endangered Species Act. And it wouldn't gull you if you were in the same position in Dakotas or in Maine to see that, you know, you didn't even have to, or does it gull you in your current position to look at your counterparts in the states and think that, you know, what kind of treatment are they getting is different because they weren't chosen by the state. There's something about, if the recovery plan has said we're going to focus on the habitat that still exists but has no wolves in it somewhere else in Maine, then you wouldn't have had all those expenses and all that trouble, right? They would have been focusing on Upper New England instead of the Upper Midwest. Well, to be clear, the reason that wolves are protected in Michigan is because Michigan chose to do it. Michigan implemented state protections before the Endangered Species Act even existed. It has led the nation in wolf conservation efforts. It was the first state to introduce wolves into its own, into territory where it had previously been in 1974. So historically it's been a leader. So the reason that wolves have recovered in Michigan is largely thanks to the efforts of the Michigan Department of Natural Resources. Your position here is no good deed goes unpunished. What are the burdens? What are the burdens that you want to get out from under? I mean, if you're committed to wolf preservation, then coordinate with the feds. What's, you know, I mean, there's this sort of thing that Terry, you want to be independent of federal involvement. But can you tell us a little more what it is? Yes, there are at least two. And the first one is what you mentioned, Judge, is that it does matter to the state of Michigan that historically states have sovereignty over their own fish and wildlife. The federal government generally doesn't unless authorized to do so under one of their enumerated powers, generally the Commerce Clause in this case. And once the population of wolves is no longer threatened or endangered, there is no longer a legitimate reason, really, under the constitutional law  So that is one reason that the state, and I think these other states that have filed amicus briefs are so interested. But the other reason, as a practical matter, is that Michigan needs to be able to manage its wolves in accordance with the needs and the desires of its citizens. Now, Michigan is deeply committed to ensuring that a population of wolves continues to thrive in the state such that it will not be threatened or endangered. But there are areas where there are persistent wolf-human conflicts, where non-lethal measures have not successfully resolved those conflicts, and where Michigan would like to be able to open small areas to targeted hunting as a way to decrease wolf-human conflicts in those areas. You say that there are areas of conflict, but am I wrong that even under a threatened or endangered listing, that where there is, for example, conflict with household pets or farm animals, that there is this take may be permitted under the federal regime? That is correct, Your Honor, that the Endangered Species Act does permit that. But the whole point is that in order for Michigan to do that, they would have to get permission from the federal government to do so. Or have a conforming state program. I mean, you could be the one to give the licenses to do that, as long as the program is conforming? No, as long as their list is threatened or endangered, we would need permission in order to do that. Well, how do you get that permission mechanically? Do you file evidence of a conforming state plan? Can you do it for a five-year program? Or surely you're not doing it individual case by individual case. I actually don't have the logistical details that I think you're looking for, Your Honor, unfortunately. We're trying to figure out how much of a burden it really is. Well, we would need to get permission. I do know that, and I do know we would need to ask, and they can say no if we want to manage wolves in that manner. As long as they're continued to be listed as an endangered species under federal law, we would need permission. But I'm sorry, Your Honor, I don't know the exact details. I mean, I think that's a pretty important part of your position, because if what you need is for the Fish and Wildlife Service to say, yes, your statute on wolves harassing domestic and farm animals has a standard that is sufficiently demanding, go at it, that's not a very heavy burden. And I'm not sure that that's not all that it requires. So I'm interested in hearing, so those are some burdens. One is, just as you say, the sovereignty question, and the other is management, anything else? Just the burden of remaining under this regime. No, I think that that is a primary. Invasion of our sovereignty, as I said in the second, is a practical means of managing wolves without federal involvement, without having it listed as an endangered species. And federal state cooperation is not an afterthought in the Endangered Species Act. Section 6 of the Act mandates the Secretary to cooperate with the states to the maximum extent practical. That's the phrase that the section uses. Can I ask if this delisting were upheld, and you went forth and were authorizing takes and hunting under your own judgment as a state, and if things went badly awry, either some unexpected disease came in and wiped out an enormous part of the population, or some other problem happened, what mechanisms are there for sort of a nimble response, timely response by the state to prevent a catastrophe? Well, we routinely count how many wolves in a very closely watched population. What do you mean routinely? Is that once a year? It used to be once a year, now we're once every two years. So if you had a sudden disease come in, and meanwhile we're authorizing the takes and the hunting and obviously tolerating the normal accidental killings that happen, that could be way too late. Well, we have lots of wolves that are collared, so we monitor their movements, and I think that if we were to see a sudden precipitous drop of wolves that we've collared, that would certainly get our attention. Has that ever happened? Not that I'm aware of. The population of wolves in Michigan has just continued to grow. It's plateaued over the past several years because it's filled out the habitable areas up there. But no, it's really a very healthy population. In fact, these past three years in the Upper Peninsula have had really harsh winters, so the population of deer has actually been the lowest point in several decades up there. So during our last count in the winter of 15-16, our biologists expected really the wolf population to take a hit because of how many deer had died during the winters, and it didn't. It's a very conservative estimate that there's at least 618 wolves still in the Upper Peninsula. So it didn't take that hit they expected. We do watch it carefully. The reason I'm asking this is because there's much debating in the briefing about, look, if it's delisted and the states are left to their plans rather than the federal protection of the statute itself, there's a great threat of these numbers going down. And you guys say there's not, and they say there is. And what I'm trying to figure out is some of this is not so easy to predict anyhow. And so the question is how quickly can responses be done if things really do start going bad? How could that situation be addressed if not because you know everything now, but if under the best, most reasoned judgments and predictions, things just go terribly wrong and there's suddenly a real threat of the Michigan population falling to precipitous or perhaps non-viable level. Counting every two years doesn't sound like quite enough, but it sounds like there's ongoing monitoring. Do you have legislative or regulatory flexibility to suddenly change, cancel hunting season, whatever? Oh, yes. Certainly the Natural Resources Commission and the Michigan legislature have the flexibility to evaluate the status of wolves regularly. And I should point out in a broader sense... Well, yes, we do. We do evaluate the status of wolves regularly. And so, for example... Regularly is different than the every two years. That's the ongoing daily, monthly, weekly monitoring of the collared animals? Yes, there's regular monitoring of collared animals. We work with our colleagues in Wisconsin and Minnesota. Our biologists have point people of contact in those other states. There's a summit held every year to discuss the status of the population as a whole because, as Ms. Peppin mentioned, the population coincidentally resides in Minnesota, Wisconsin, and Michigan, but the protection and the management is of the population, regardless of where it's located. So we work closely with our other state partners to evaluate the status. There's a yearly summit. There are people that are dedicated to watching the wolves. I mean, when I say a formal count, there's a formal count now every two years, but that's kind of a formal estimate of the numbers. But that doesn't mean that in the meantime, during the year, during each month, that there aren't staff people that are constantly evaluating the status of the wolves. And in terms of how to respond to a sudden precipitous drop in population, certainly if there is a sudden drop, then there wouldn't be any small hunts authorized for that year. And I would say that that would be the first thing that would come to mind. But there would also be ways to quite – it's just so hard to describe. Is there any mechanism, what if after the delisting, not your state, but one of the other two states, someone said, we're done with this, the cooperation doesn't work. Sometimes when states get together, things don't always work as well. And so what would happen then if one of the other states or the other two states said, we're not playing anymore, we're going on our own, our dignitary sovereignty interests. We're going to protect our own, those within our state, and we're not going to worry about this. What would happen then? Well, that, I think, is the role that the federal government continues to have. And there's a mandate in the act that requires them to continue to monitor the status of the species after it's been delisted to anticipate and to account for situations. Yeah, but they can't do anything until it actually gets to the level of threatened or endangered, right? They could make an emergency listing. Even if it's not threatened or endangered? Well, I think that they could make an emergency finding that it's threatened or endangered because of the precipitous drop in population. But they would have to wait until it got to the point of actually threatened, at least. As far as what the guidelines for how the Fish and Wildlife Service makes that decision, I think I don't have that exact information. Thank you very much. Jim Lister. Good morning. Jim Lister for the Defendant Intervenors in the Hunter Conservation Coalition. I'm here primarily to discuss one of the issues designated for oral argument. That is whether FWS's obligation to use the best scientific and commercial data available when deciding citizen petitions to list or delist a species allows FWS to revise prior decisions regarding the scope and definition of the species that is the subject of the citizen petition. I believe that the answer is yes. The HCC members, including the Sportsman's Alliance, filed citizen petitions to recognize a Western Great Lakes pristine population segment and delist it. That was done in 2010. And in 2011, FWS, after taking public comment, found that the petition was warranted. And it did that. I urge your honors, as you review this case, to look very carefully at the portions of the final rule which discuss the areas surrounding the four recovery populations in Minnesota, Wisconsin, and Michigan. And what we will find are well-supported fact findings that the areas to the periphery are areas where wolves might roam, but they're not suitable habitat to establish long-term living in those areas. A roamer could go, could come back, but they're not going to den and form packs. And that's not because of lack of protections in those areas. It's because even with protections, there is just not suitable habitat. Therefore, those areas are not a significant portion of the range of the Western Great Lakes wolves. Since they're not a significant portion of the range, there is no obligation to recover them. Can I ask you a question on, the service here said that in analyzing the state plans and the consequences of delisting, that it didn't have to address the impact of hunting because it was highly speculative whether hunting would happen. Do you agree that it's highly speculative whether hunting  After delisting, hunting did happen in Wisconsin. So that was quite a mistaken determination by the service that it was highly speculative. It happened pretty fast, did it not? It did happen, and in the district courts... Did it happen pretty fast? I'm sorry, I didn't understand the question. I'm sorry, did it happen pretty quickly, as I recall? Yes, yes, it did. And the populations were so well above the recovery thresholds that there were fact-findings in the district court records as to how much they might come down with hunting, and that coming down was far less than would be necessary to bring them all the way down to the recovery thresholds. In other words, with or without hunting, the recovered populations are well above the recovery thresholds. What do you do with the fact that hunting is certainly the type of impact that needs to be analyzed in deciding whether to delist? And the service here just dropped the ball on that. And that's not an indictment of how the hunting's gone or anything like that, as you said. It's really a question of what do we do with the fact that they didn't address it at all, they didn't analyze it, and it is clearly the type of impact that needs to be factored, and the answer might very well be the same. And now they even have a record to look at, but they didn't address it at all. I guess I'd have to disagree with that. There's voluminous comments on the impact of hunting, whether there would be hunting, whether Minnesota would hold off for five years or not for five years. There's a great deal of comment on that. I know there's lots of comments. If I'm misunderstanding here, my reading of the record was that the service's response was simply, it's highly speculative. And there was no more analysis that I've seen by the service. It's not a question of comments coming in. It's a question of whether the service did what it's supposed to do, and that is address that concern in any meaningful way, other than this patently erroneous declaration that was highly speculative. Yeah, I think the way to address this is what is the impact of this. We have in the record in the district court's finding on standings precise figures on what the impact of hunting was after delisting. The district court made some judgments. She found that there would be a relatively modest reduction because of hunting. That that was enough to give the plan a standing, but it was nowhere near enough to bring it down to the recovery plan level. So whether you talk about harmless error or ferocious error, it had, in the end, no impact on whether these wolves are recovered. Is there harmless error? Is harmless error available under the Administrative Procedure Act for failure to address a recognized factor that's supposed to be addressed in endangered species? It had no impact, and it's in the last sentence of 5 U.S.C. 706. And is that just how long-term is that? Well, how long-term in terms of the impact of hunting? The states conduct wolf counts. There were hunting seasons there no longer because of the reinstatement of the listing. The states conduct the wolf counts. On top of the states, the federal government would post the listing monitoring, and on top of that is the emergency relisting power. So there's multiple layers of protection there. What I wanted to address... The emergency listing, am I wrong? I could be wrong, but can they do an emergency listing before a species is threatened? If it's threatened with becoming threatened, can they do anything in that? The Endangered Species Act protects species that are threatened or endangered. Okay, so they can't do anything until we get to the level of being threatened. Yeah, that would be a violation of the statute to do that because it would only allow that species that are threatened or endangered. The central point I wanted to make, and I realize I'm out of time here, is that the district courts found that the statute granted the FWS flexibility in 1978 to tailor protections where needed. The core states are not where these protections are needed because they're recovered. But then the court found that FWS sacrificed that flexibility by making a decision to list at a broader level, Pacific Ocean to Atlantic Ocean, with a carve-out for Alaska and a semi-carve-out for Minnesota. What most caught us about this decision was the way the district court, and where I think prospectively the district court erred, was in giving sort of dispositive permanent force to an election that the service made in 1978. When administrative agencies aren't bound like that, they can change their mind. We may debate the level of deference to an administrative agency when it changes its mind, but we don't doubt the power of the agency to change its mind. So let me ask you, and I take it that I understand what you're saying, to this broad, basically nationwide designation, should that limit the flexibility. But there's also the character of the Dangerous Species Act, that wherever a species is found, it's protected. So if, you know, there's no crocodiles in New England, but if somebody brought a crocodile to New England and was keeping it in a bathtub, and a human did that, they would be liable to criminal penalties, right? Correct, Your Honor. The delisting doesn't extend outside the Western Great Lakes CCS. And so if we have a delisted Western Great Lakes, and a still threatened listing in the New Mexico area, and there isn't a genetic difference, and there's not a taxonomic difference between the wolves that's been established. That's not something that the service is relying on here, right? The wolves are the wolves of the wolves in the country. And somebody brings a big truckload of wolves to my inn in New Hampshire, because I want to have a big hunting party. And people go out and hunt these wolves. There's going to be criminal liability if those wolves were brought from New Mexico, but not if they were brought from Michigan. Once the wolves leave the delisted boundaries of the DPS, they're protected, and their criminal penalties pertain to you. If you were to bring them outside the boundaries of the DPS. Let me sum up. Our central point is that we as citizen petitioners have a statutory right to decision based on the best currently available scientific and commercial information. The district court erred by binding FWS to a boundary decision on the scope of the delisting analysis that's made in 1978. By statute, a distinct population is a species, is an appropriate granular level for a delisting determination. There's no question that the Western Great Lakes wolves have recovered, and that the areas where there are not so many wolves in the Western Great Lakes are non-significant range portions without suitable habitat. That drives everything, and the 1978 decision should not have bound the agency in 2011. And Mr. Lister, if my in were in North Dakota, then fine. That's right. That's within the part of the Dakotas. The line goes down through the middle of the Dakotas. All right. Thank you very much. Mr. Henry. Good morning. Good morning. And may it please the court. The service says the species at issue here is a distinct population segment, and so is the different species under the act. But the species in all reality is the gray wolf. And small little pockets, we've had some discussion of those, matter. Those things become big pockets, like Minnesota did. And here, important to this decision, and the reason why the district court is correct, is because the service is not writing on a blank slate. There is a preexisting listing throughout all the lower 48 states. And the practical impact of the problem with the service's approach is that as a result of their one-directional analysis, that is looking at the threat analysis to determine whether or not protections are needed to maintain the viability of this core population in its current range, is that we don't know, as a result of this rulemaking, if the Great Lakes population should still be protected for the purposes of furthering recovery to an area that is still listed. And so I think that that's a key element of this case, is that the service has effectively left for another day the question of the impact of removing protections from the Great Lakes population. That's not the most fundamental issue, is it? The most fundamental issue is what does the language of the statute authorize the service to do? And what is the language of the statute you claim the service has abridged, has negated? I think in the first instance, with respect to the designation of the DPS, I think it's clear from the statute that you cannot list and delist an entity at the same time. How is that clear from the statute? Is there anything in the statute that directs the issue? Sure. I think a natural reading of Section 4 does stress that. So if you look at Section 4, it talks about the service must determine whether an entity is threatened or endangered. And then following that, there are affirmative obligations. There is a duty to designate critical habitat. There is a duty to recovery plan. And so the service chides the plaintiff for sort of attempting to inject a temporal element here that it says doesn't exist. But there's some time involved intrinsic to the statute where the only natural reading is that if you're going to create a new entity under the Act, if you're going to designate it, whether it's a species, a subspecies, or a DPS, that listing needs to come with an effort to protect that entity. Those are obligations under the Act. And so you can't, in the same breath, declare something threatened and endangered and not threatened and endangered. But really, there's a lot of history here, and their alternative position is, you know, we recognize the endangerment of the population. States did before the Karenian State, before the DPS definition. They were being treated as a distinct population. They stacked their DPS. You know, so clearly, all those duties that you talk about, identifying critical habitat and looking at the regulatory mechanisms and other forms of threats, that's been happening for decades. So the real question is, as they frame it, once the species has rebounded, and it is a population that for conservation purposes is a logical unit, it's a population that has enough members, it has enough habitat, it has enough breeding pairs, it has enough stability at a robust level over a period of time, it's done all that. And they're saying, now we, as a matter of state sovereignty, as a matter of resource allocation, would like to turn our attention elsewhere, and this is what we think this unit is, and so why not allow what was a Minnesota unit and has now fortuitously expanded, be deemed to be, have the boundaries slightly adjusted, but it was the old unit. Now let's just deal with it. Why not? What are the statutes? Well, I think the answer is twofold. First, because the Fish and Wildlife Service never actually considered the Minnesota listing to be a functional DPS. As the Fish and Wildlife Service explained, the service listed 1978 species throughout the lower 48 states, and the distinction with respect to Minnesota was for regulatory convenience. And I think that the service has defended that position with respect to other species that were listed not as a DPS. In fact, in the Coos Bay case and the Ninth Circuit with the marbled merlets, I don't think that is included in the briefing, and so I will, in Coos County case, excuse me, I will provide the site, 531 F3rd 792. The Fish and Wildlife Service defended its continued listing of an entity that was neither a species, subspecies, or DPS. And so the service has sort of taken this position that an entity doesn't have to be an implied or functional DPS. And so I think the result here, again, is that whether you're looking at this action as having carved out a DPS or having expanded the Minnesota listing, a necessary conclusion is that the service has included into this designation, this designation now, areas of the wolf range that are within the lower 48 listing. And again, the service is not running on a blank slate. So we can't myopically look only at the current range and include in it areas that were included in the lower 48 listing and then not apply the Section 48 for analysis to the lower 48 listing. The lower 48 listing is on the books. The service needs to deal with it, and if you are revising an existing listing, you do so under the Section 4 analysis, which includes the threat analysis, and it didn't do that here. And in fact, it doubled down on that because with respect to a significant portion of the range interpretation, which I would suggest actually is not entitled to Chevron deference because with respect to reliance on the policy, the policy postdated this rule. Now, I will admit that the interpretation is generally the same as the service had in the rulemaking, but I think just on the issue of deference, the policy is not entitled to Chevron level deference for purposes of rulemaking. But beyond that, case law from this circuit and from the Supreme Court says that the service doesn't get any deference to a statutory interpretation that is unreasonable or so narrowly construed as the statute as to render it non-operational or undermine its purpose. And I think what the service did by focusing so clearly only on current range is that it engaged in a one-directional analysis so that even if you dig in to the record and you look at the threat analysis of which there are 30 some odd pages from JA 1142 to 1176, and you look and the district court did do that deep dive, and I think its factual findings are correct in this regard. The service's one-directional approach looks only to whether threats are not so bad as to render the current population in its current range non-viable in the foreseeable future. And that one-directional analysis, I think, is inconsistent with the statute, especially when we've got a larger listed entity here. And so what the service has done by declaring a DPS and then not looking beyond it and then even within it in terms of applying a significant portion of the range analysis within it but giving short shrift to the value of the current population to potential recovery the other direction into unoccupied land, unoccupied areas, is that it has done just what the district court said is so dangerous. It could draw a line around the current population and then delist everywhere. What other habitat are you thinking about when you say it could further expand? Well, I'm no expert, so I'll turn to what the Fish and Wildlife Service has said. The Fish and Wildlife Service has said in the past in rulemaking regarding wolves that there is viable habitat, and in this case the service is talking about suitability for occupation. In the northeast, lower peninsula of Michigan, southern Rockies, and North Dakota, which happens to be a swath of land right in between the core recovery population of the Great Lakes and the northern Rockies. And an area in which we have seen, as is mentioned in the record, albeit only in the context of discounting these dispersals that I'm about to mention for purposes of defining a DPS and then ignoring them, dispersals from wolves in the northern Rockies to the Dakotas and dispersals from the Great Lakes hundreds of miles. And so this is a real practical concern. And I think one thing the district court also pointed out that I think is crucial here is that the extent the service said anything about unoccupied land, it only talked in the terms of suitability of inhabitation, suitable habitat. And the service is correct that this one directional analysis left unreviewed threats to the species like inadequate prey base or insufficiency of gene flow, which was a big issue in the northern Rockies litigation that this court just heard argument in last month and was a reason for rejection of a prior northern Rockies delisting rule. Those threats that may be an unoccupied area, even within the DPS, they weren't reviewed at all actually in that area. The only issue that the service looked at at all with respect to unoccupied areas, and only did so briefly, is this issue of whether there could be permanent occupation of wolves there. And permanent occupation can't be the defining factor for what constitutes a valuable portion of a species range. I'm not sure what your point is about the gene flow. In terms of prey, you're saying even if some of the surrounding areas, let's say, are not suitable habitat for the wolves, there might be habitat for the wolves' prey and therefore? That's correct. And with gene flow, I think it's even better example actually. So you get these dispersers. And what the service has repeatedly said is that in many rulemakings in both poor recovery areas, is that because of the unique nature of wolves as a native carnivore, a canid, a pack animal, in order for the population to be self-sustainable in the long term, we need these dispersers to go out and share their genes. And so even if those dispersers go out into an area that they can't inhabit permanently, that area may be a dispersal corridor or a habit corridor between areas. And so we're talking about... Hello Cupid for wolves from... Exactly. And this is some speculative concern of over-emotional environmentalists, right? The record shows, albeit briefly because, again, it's discounted, that we've got dispersals going through the Dakotas. And we've got the service in prior rulemaking. If you can look at Volume 71 of the Federal Register, page 15279, that North Dakota actually does contain areas of viable, occupiable habitats. So we've got a swath of land in between poor recovery areas that the service has put blinders onto in the context of this rule. Can I go back? So your statutory argument is that the service doesn't have authority to use the DPS to delist, right? To delist, is that correct? To designate and delist at the same time. At the same time, at the same time. And that's crucial to the flexibility question as well. So that's your statutory argument. But do you take issue with the way the service has interpreted how they're to determine the DPS? Because in their policy, they clearly separate the determination of the DPS from the determination from the delisting issue. They're separate inquiries, and yet you want to require them to make them one at the same time. You say you can't. They can't make them one at the same time. I don't understand your view of their policy. Right. I would say that in terms of discreteness and significance of defining the DPS, I don't think that there is a dispute on the table here. That's not something the plaintiffs have raised. But I think in terms of the interrelation of the threat analysis, which includes looking at whether the species is threatened, endangered, and therefore includes a significant portion of the range issue, and the designation of the DPS issue, I think they're interrelated. I don't think the service can play this two-step to try to avoid the significance of the range. Why can't they? Their policy allows them to. Is it your argument that the policy runs afoul of the statute? I don't think that's an argument you've made, but maybe I missed it. I think that it does to the extent that they're not writing on a blank slate and that this DPS is surrounded by a larger listed entity and a point of fact is being drawn out of it. I'm sorry, I don't understand. Let me read to you the language of their policy. If a population segment is discrete and significant, that is, it is a distinct population segment. So if they've undertaken an inquiry and they found a discrete and significant population, call them DPS, its evaluation for endangered or threatened status will be based upon the act's definition. It seems to me from the policy they can do exactly what they did here. They don't have to find a DPS is threatened or endangered according to their policy. Do you have issues with their policy? Not in that regard. I don't think we do. But the problem is beyond that. The problem beyond that is that once they have designated that DPS according to that policy, they proceed by considering a new species. Only look at threats within that DPS and not outside it. Here we're not designating DPS from nothing, from a species that doesn't need protection. But we've got this larger list of entities that the DPS is in fact being carved out of. What it leaves is a non-DPS remnant. This came up as a major issue with the 2003 rule and in the District of Oregon and Vermont cases in 2005. What the District of Oregon and Vermont said is you can't leave even applying the DPS policy correctly. A non-DPS remnant from an existing listing that you haven't applied the delisting factors because you have in point of fact removed that DPS from within it. And even if, again, you consider the service to be working from this Minnesota baseline, it's still revising the lower 48 listing. In fact, after it first attempted this in 2007  the service went back three months later, got the solicitor's opinion. And if you look at the solicitor's opinion, the solicitor's opinion hasn't sort of... at that time the agency hadn't come up with this Minnesota alternative entirely yet. And so the solicitor's opinion talks in terms of carving out the DPS within the lower 48 listing. And so I think that the problem is... I'm sorry, so it's both... You've got your... I'm sorry, I'm sure it's right. It's both a statutory argument and it's also a record argument. So when you've got the situation where you already have a list of species and then they carve out the segments, that the statute requires them to do two things. Both make the determinations you need to to carve that out and to determine its status, but then they also have to look at what's left and determine what the impact of that carve-out is on the survival of what is left. And it's that part, it's that second inquiry that is the problem here, that they didn't figure out what the impact of drawing that out would be, would it then essentially render the listed species extinct other than their segment pockets in the rest of the United States? That is part of the problem. It is a record-oriented problem in one respect because the record has this larger listed entity in it and the service needs to resolve that consistent with the Act, which, again, I'd like to get to the flexibility point and say that there is flexibility here at some point. But I also think that there's this additional statutory component to that because in leaving a non-DPS remnant, there's a real question as to what that leaves in terms of the workability of the ESA to that remaining entity that remains endangered. Can you say the non-DPS remnant? What exactly are you referring to? What's left over of the lower 48 listings. Everything. Apart from what's been carved out as a separate sub-species or by Congress and legislatively delisting, but what's left that we have now of the lower 48. And what's the problem? And the problem is you've got an additional statutory problem there because you've left an entity that is neither a species, nor a sub-species, nor a DPS, nor the legal artifact that the service has defended in the course of upheld prior to the DPS policy. And what's interesting about that is that... I thought you just had a species. I thought you did have a species. Well, you have a species minus a DPS. Right. Well, I think I can explain this well by pointing to the service's own words because shortly after finalizing this delisting of this DPS rule, but before the district court's judgment, the service promulgated another rule which it proposed but has stagnated on. And that proposed rule was in 2003. That proposed rule is at Volume 78 of the Federal Register, pages 3, 5, 6, 6, 4. And what that proposed rule purported to do, plans to do was to delist the species throughout most of its unoccupied range. And the justification for that was, I quote, it is not a valid entity under the ESA. So the service engaged in this sort of gymnastics exercise with respect to use of the DPS policy where it draws a DPS, calls it a new species, analyzes threats only to the continuing viability of that entity, removes the protections from it, and then step two is to go back and say the rest is invalid under the Act. That can't be the case. That's a statutory problem under the Act, that leaving the non-listed entity is the service's fault. I'm sorry. What do you mean the rest is invalid? I'm sorry. I'm talking about the remnant that is the lower 48 that no longer has a population within it because the service carved it out. Does it have the New Mexico population? It does, although the New Mexico population, just to clarify, is recognized as a separate subspecies. So the subspecies of gray wolf is not considered within the lower 48 listing. And the rest does contain wolves that are in Wyoming. The service attempted to delist throughout what it calls the Northern Rockies DPS. That was rejected among the dozen or so courts that have rejected every effort the Fish and Wildlife Service has made to reduce or remove federal protections from wolves. But Congress then legislatively delisted a portion of it. So there are still wolves within the lower 48 listing that are in Wyoming. But according to the service, that area, or at least large portions of unoccupied areas, the areas that are exactly the areas that the Endangered Species Act says we need to protect the most. It's the areas at the margins of the population that matter. This gets back a little bit to the question that I had of what happened for the service, and she disclaimed it. But it does seem to me just functionally that really a big moment in administration of the act is how the service defines the recovery plan. They initially list the species nationwide. Then they come in with a scientifically supported recovery plan, and they say this is our goal for the species nationwide. We're going to create these, we hope, three separate populations, and maybe with some little local satellite populations as we've seen on the record. They're going to be buffered from harms to one another. When we look at the picture nationwide, that's going to count in our view as recovery. That's insensible. What's wrong with that? That is sensible, and if there's nothing wrong with that, where did they go wrong in their effort to achieve that goal? There are a couple things that are wrong with that. First, the service worked from a nationwide or a lower 48-wide listing, and we've never had...actually, wolves are fairly unique among native listed species in that they've never had a recovery plan across the range that they were listed. In fact, the recovery plan we're working from here is severely outdated. It's 25 years old. It's supposed to apply to a subspecies that's no longer even recognized. What the service did was it applied recovery plans to portions of the range it listed. What we've never had is we've never had a national wolf strategy. The reason why I use those words, they aren't mine. They're the service's. In the proposed rule in May 2011, in this listing, the service proposed a national...what it said it was going to do was it was going to engage in a national wolf recovery plan. We're going to say what happens in the Northeast, whether or not it should be declared as a DPS and protected. We're going to say what happens in the Pacific Northwest. We're going to discuss whether or not wolves can be expected to go into the southern portion of the Rockies, and that's a significant portion of the range, or it's not a significant portion of the range. We're going to finalize that effort, the national wolf strategy, when we finalize this rule. Then they never did. Perhaps because it was most convenient and expedient to just deal with the Great Lakes. Recovery plans aren't static. Recovery plans can change. They can even change as the listed status of an entity changes. They can even change in the rare event where the service can justify changing the entity itself. Science suggests that a species can change to a subspecies, or the service can, by application of the DPS policy, declare a portion of a species a distinct population segment. After doing that, the service can amend the recovery plan to address the needs of the listed entities. The service did just that with respect to other entities. The question was posed, has the service ever used the distinct population segment to split a species uplisted in part? Yes, the service has a perfect example of the regulatory flexibility that the DSA does afford, even using DPSs, is the stellar sea lions. In 1990, the service listed stellar sea lions wherever they are found in the United States as threatened. In 1997, after promulgation of the DPS policy, the service split the sea lions into two stocks, an eastern stock and a western stock. It was no secret at the time that the service felt that the threats to the species were greater in the western end of the range than the eastern end of the range. But the service said, we can meet the discreteness and significance criteria with the eastern stock and the western stock, so we're going to split them into two DPSs. And it did that in 1997. That's at volume 52 of the Federal Register, pages 2, 4, 3, 4, 5. After that, the service updated a recovery plan to describe the recovery goals for the eastern stock and the western stock. I should back up a second and say that the service uplisted the western DPS at the time it split them. So the eastern DPS maintained its status, threatened, as it was when it was listed entirely within the United States. The western stock got increased populations. The stellar sea lion, S-P-E-L-L-E-R, although they are also A.R. Stellars, but I promise you. And then after updating the recovery plan, the service in 2013 delisted the DPS that was the eastern DPS. No one is saying that the DPS can't be delisted. You just can't list a DPS, delist at the same time, from within a larger entity without dealing with the larger listed entity that you put on the books and what the impact of removing protections from the score population are to your obligation to promote recovery. And respectfully, I disagree with the government that its obligation is just to prevent species extinction. That is equivalent under the ESA. That is equivalent to saying if a species is not extinct in one place, it's not extinct anywhere else. The ESA does embody the goal of promoting recovery, including into unoccupied territory. The United States Supreme Court has instructed us as such in Tennessee Valley Authority v. Hill at 437 U.S. at page 184. Is there a definition of it? Because I kept trying to find a definition of extinction for purposes of this statute and whether you can declare it extinct in portions of the U.S., an animal extinct in portions of the U.S. or not. Yeah, I don't have a more precise answer, unfortunately, than Ms. Pepin. I'm sorry. I do think that extinction is a concept that is applied to the species once designated as an operation of the statute. But again, exactly sort of the same answer with respect to the interrelation of the threat analysis and the designation of DPS. It can't be the case that you create a statutory problem by engaging the statute even if lawfully in one regard, even if the service delists in one area and can declare it extinct in that area. If it's got a larger listed entity, it needs to deal with the conservation status of that species in that area. And so the Supreme Court has said the obligation under the ESA is to both halt and reverse the trend towards species extinction. The district court pointed out one way the statute operates is to suggest that promotion of recovery is a real goal of the ESA by looking at the first factor of the threat analysis under Section 4A1 and saying that it doesn't make sense, the position that you focus only on current range and prevent extinction there, if the required portion of the analysis is to review threats throughout the present and potential future curtailment. Because absent potential future curtailment, there is no such thing as present curtailment of the range. You can't analyze threats in it if you're focused only on current population and not recovery. I would also point the court, for instance, to the definition of conservation. Under Section 7 of the Act, there are affirmative obligations placed on the government. One under 7A2 is to prevent further species impairment, to prevent jeopardy. Under Section 7A1, another obligation is to proactively promote conservation. And under the definition of conservation in the statute, under Section 16 U.S.C. 1532, conservation embodies the concept of recovery. In fact, Congress specifically said that means available to the agency in administering this act for the conservation mandate include propagation, live trapping, transplantation, i.e. reintroduction. And that's exactly what the service did in the mid-'90s in Yellowstone. In the mid-'90s in Yellowstone, there were no wolves in the northern Rockies. That was unoccupied portions of the service's lost historic range. In other words, according to the service today, not a significant portion of its habitat. Can I ask you something on the question of reference to historic range? How do we define or how do you think the service is supposed to define which history? How long a history to use? Do we go back to Columbus, pre-Columbus, Columbus, all the way up to the ESA's adoption? What time frame? Right. I don't have a precise answer myself, but I think that the answer cannot be just current range because I think that blue pencil subverts a significant portion of how the statute just makes it range. But I also agree that it can't be all historic range forever. I think no one is suggesting that the wolves need to be listed throughout their historic range back before settlement of North America, as Ms. Pepin suggested. What we're saying is the words significant portions of the range need to be given a real meaning, and that meaning may include areas of the range that are unoccupied but still viable, areas inhabitable, areas of the range that even if inhabitable might be these dispersal corridors between habitable areas. But if there are areas where the species cannot be... What would that look like here? What would that look like here? For instance, within the larger listed entities that's being ignored here, the area of the Dakotas that falls right in between the eastern edge of the northern Iraqis region, as the service has defined it, and the western edge of the Great Lakes region, as the service has defined it, is a viable area for dispersal of individual animals to exchange genes and even includes some areas that the service has previously said are suitable for permanent occupation in North Dakota. This is an area that the service should, I think, seriously consider as a significant portion of the species range, which it will not do so if it has a categorical interpretation of the ESA that limits significant portions of the range to that area which is currently occupied. It seems like... Forgive me, because I think that there is something in the statute, like habitat is defined separately, but in common sense terms, it seems like one way of understanding range is as habitat that exists now, but is not populated by a species. There's habitat that has yet to be, you know, Chicago hasn't been built on it, and if there hadn't been an endangerment or a threat status imposed on these species, they would be there. But that's wrong? I'm not sure I understand the question. Well, why don't we think of range not as where the animals did go historically or where they do go now,  why isn't range, potential range, in the current world? I think that's what I'm describing. I think it is potential range, but I would also include areas that may not be inhabitable for purposes of occupation. I hear you. But that they go through. So you're not at the bridge kind of idea. Potential range. Is there not a separate term, habitat, in the statute that would sort of militate against reading species range as habitat? Is it a separately defined term? You're basically saying habitat in the sense of potential habitat is how you understand range. That is, and I think that's how the ESA understands it. Are you distinguishing that from critical habitat? I think that's part of the confusion. If you look at the term critical habitat, which the species has an affirmative obligation to designate four listed species. Once they're listed, then you move on to 4A3, and there's shall designate critical habitat, although there are certain findings that the Secretary could make that would allow him to not designate critical habitat. But the definition of critical habitat is in the statute. Now, I don't think that purports to define critical habitat generally, but in terms of the definition of critical habitat, I think what's interesting is that a whole paragraph is dedicated to unoccupied portions of the range. Once a species is listed, there is an affirmative obligation to designate critical habitat, which by definition includes unoccupied portions of the range, except under the services view, unoccupied areas of the range are not significant. If unoccupied areas of the range are not a significant portion of the range, then the species can't be defined as threatened or endangered, right? Because it's the definition of threatened or endangered that includes the phrase, in all or a significant portion of this range. So how do you give meaning to the definition of critical habitat, appropriate meaning to it, if you categorically exclude anywhere but the current range? And the service says, in the significant portion of the range policy that postdates the rule, the service says, well, I think it was perhaps drafted by a lawyer who was thinking about the sensibility. It says, well, you know, as a categorical matter, we're not going to include unoccupied historic range as a significant portion of the range. But it's still important to the threat analysis. So we're still going to look at all those unoccupied areas, except that the district court correctly found here the one-way direction of this analysis, the sort of myopic focus on ensuring the long-term viability of the current population and the current range doesn't comport even with the significant portion of the range policy. Let me just circle back. I think I may have misspoken in talking about the recovery plan. What was the document or planning process that yielded the choice in repopulating North America or repopulating the United States with wolves that chose to focus on these, what are now, I guess, three areas? Where did that decision come from? I do think it comes from the services recovery plans. I do think that the recovery plans are where the service identified the core recovery areas. And they just did that from science, right? And they looked at it and they thought, where are we going to make this most successful? That's right. And we disagreed with them. That's right. And they chose some places and not others. That's right. But in that context, when you say they didn't choose others, they didn't choose them for core recovery areas, areas where the species might start in small pockets. But then those small pockets become bigger pockets, as Minnesota has. They didn't say we're also going to ignore everything else in the recovery plan. Recovery plans don't justify ignoring unoccupied areas of the range in the larger listing areas. So the service is to be applauded for using best available science at the time the recovery plans were drafted. So long ago, maybe it's not the best available science now. They ran into a little bit of trouble on taxonomy with their proposed rule. But the service is to be applauded for saying these are the areas where we should, they're core recovery areas where we should start reintroduction. Could they have chosen the Northeast? Maybe so. Would it have been justifiable? Sure. But what we know is that they didn't say they were not going to permit the species to expand its range into unoccupied areas or that that was impossible in the context of the recovery plan. And is your challenge to the final rule as backing away from the separate listing of CU-Lycoun, is that a noted challenge or is that a not by scientific evidence challenge? Notably, it's not one that the district court rested its opinion on. But with respect to the way that we brought the challenge, we did bring it as a best available science challenge. And the way that we sort of conceptualized that issue is, again, the service came up with this new species, found this heretofore non-recognized species that was previously thought of as, they're linking it to a previously thought of subspecies. And they discovered magically that it happened to exist just outside the lines of the DPS that it drew in 2007. And so what that meant for it was that they were no longer designating a DPS at the same time to delist it of gray wolves because they were just going to be delisting gray wolves everywhere they're found because everything outside the line now is this newly recognized species. And a bunch of commentators, including pesky critters called scientists, said that's bonkers. And so they backtracked from it in the final rule. And I think the service, again, is to be applauded for backtracking because they have an obligation to use the best available science. But what they didn't do was they didn't say what species is at issue, which is kind of a fundamental thing when you're listing and delisting species. They could have, on the one hand, said, we think there's a new species. Well, now the science says there's not. So this is the species and why the best available science says we should use the species. That's not what they did. What they said was, here's the species. The science says it's not there. We're going to back away from it. And we're just going to proceed as we were planning to before. And we're not going to, and they're just sort of going back but not saying what the best available science is with respect to the species. In fact, what they're saying is we will leave that issue for another day. Great. Thank you. Unless there are further questions. Thank you. Ms. Duncan, you asked for four minutes. We'll give you back four. We took your time, so. For rebuttal. Thank you. I'd like to first address the issue of whether the service can leave a non-DPS remnant. This issue has been litigated before. In 2003, the service published a rule that divided up the entire lower 48th into three DPSs, leaving no DPS remnant. It was downlisted from a major to threatened in the eastern DPS and the western DPS and remained endangered in the southwest. And the service was sued by Humane Society, Center for Biological Diversity, and a number of other environmental groups. And on the ground, these DPSs were too large and included too much unoccupied territory. And the Vermont court, I think Councilman spoke, it did not hold that the service could not leave a non-DPS remnant. On the contrary, the service was justifying the unoccupied territory within the DPS on the grounds that it could not leave a non-DPS remnant. And the Vermont court held, yes, you can. There's nothing in the statute that says you can't. So we've kind of come full circle. Hang on here. That was a district court decision, right? Yes. Chose not to appeal it. Yes. It wasn't appealed. Right. And we are divided by that in this case. Well, this is what I'm trying to figure out, because what's to stop the service from turning around after it's sort of Swiss cheese species to creating these segments and then going, wow, we listed this species nationwide, and now the thing that's left there is not a species, it's not a subspecies, and it's not a segment. Oops. We will delist on that basis. That can happen. Is that the plan here? I don't – there is no – They quoted language from a rule, a proposed rule. Yes, that rule was proposed in 2012 or 13. Is it withdrawn? It hasn't really gone anywhere. Is it withdrawn? No, it was not withdrawn, but I think the time has run on which they can act on it, so it's effectively a deadline. So does that not state the services position that it can Swiss cheese these listed species? The services position is that it can do what the statute allows it to do, which is to define a DPS in accordance with the DPS policy and treat that as a species under the Act. This goes to the very question of whether your reading of the segment policy is accurate, and that is because you have to read the statute as a whole. We can't just look at the single definition of species as you've been pointing to. We have to look at the whole listing and delisting process, and it's the consequence of your interpretation of the segmenting authority is that every time you create a segment, unless you divide the entire listed species up into segments, every time you pull one segment out, no matter how small, imagine you had just done Minnesota as you had originally here, then that entire listing for everything but Minnesota collapses. It's improperly listed as a statutory construction matter under the Endangered Species Act because that leftover, which is everything other than, we'll say, Minnesota, is not a species, it's not a subspecies, and it's not a segment. It might and might not be. That would be a factual question. Is there a population in that remnant that is... There is no species minus Minnesota. Well, it's like a DPS. Not a subspecies. In the original listing, and I can say more... But he had made the findings for a segment. They created two species, Minnesota and the other 47-plus, Mexico, and they used the proto-DPS language, an especially similar authority at least with respect to vertebrates, to list a group of animals in common spatial arrangement. That might have been mistaken then as well, right? And that might have been mistaken then, yes. Certainly Minnesota had a group of animals in common spatial arrangement. Query whether the other 47 did. But they exist and they have to be dealt with. And the Minnesota species has been dealt with through this rule. It has expanded. It is viable. It is recovered. And I'd like to address what recovery means. It is defined in 50 CFR 402.02, recovery is defined, and it means not in danger of extinction. And is extinction defined anywhere? Not that I know of, yeah. Is it that critical? How can I know what that means? I think it has a common meaning then. Extinct means extinct. No, no, I don't know what the common meaning is. If you talk about does extinct mean extinct in the U.S. as a whole or does it mean extinct in 50% of the United States? It means the species. Whatever species you're analyzing under 401A, it is that species. So it could be the whole taxonomic species worldwide, it could be the whole subspecies worldwide, or it could be geographically delimited, in which case that's a DPS. I understand. But when you have the situation you have here, where you have first listed and found endangered a large species as a species, and then you come in and pull out a pocket of it, isn't it incumbent upon you to address not just the status of that pocket, but to address the status of the remnant? What is it? What is its status? And, two, address in the process of pulling that pocket out, are we dooming the listed species to extinction everywhere but that pocket? Do you have to just address those things? I'm going to try. I agree. Do you, as part of your regulatory process, have to address both aspects of that? Do you agree? No, I don't agree. If there is an impact, which in the ordinary case there would not be because of the definition of DPS, a DPS must be discrete as well as significant. Discrete is defined in the DPS policy as markedly separate from other populations of the same taxon. So it would be, I don't say it's factually impossible, but it would be factually rare for the delisting of one DPS to have much of an impact at all, any impact, on the status of the remaining population in another listing because it wouldn't be a DPS unless it were markedly separate. And that is certainly the case here. There's 400, 600 miles, if the actual rule is 400 miles between borders, of this population and the nearest U.S. population. Although I would like to point out it's extremely well connected to a population of 6,000 wolves in Canada, so there are not genetic connectivity issues with this population. So what did you have to address? You pulled this out, and you didn't just pull out Minnesota. It changed from what it had been before. I forget the language of the closed barrier, whatever it was before. You pulled out now nine states. And so you necessarily changed what the remnant listing was, what you'd had before. Because you pulled out nine, and you have to address, well, what is what we had before minus nine? What is it now? And what is the impact of this separation on the extinction and endangerment or threatened status of that remnant? I don't understand how you can tear things apart and only have to address the one half. Because the protections of the Act apply to the species, not the range. And the service has made that very clear. You can find that in the statutory addendum at page 837. Okay, but both have been listed. I mean, you didn't delist the species when you did this. No, no. The population of wolves in the lower 47 listing outside of Minnesota, it's the population that's protected, not the state of South Dakota. It's the wolves. It's the species. I mean, you just told us many times that it protects species. They don't know population that's protected. They talk about species. The statute says species, subspecies, and segments. In that species, the population is the species. It's not conflicts worldwide, which is a very healthy thriving species. It's not any subspecies. The lower 47 listing is also a proto-DPS. It's a geographically delimited listing of a species. So it's a population that is protected. And under any listing. I'm sorry, it's geographically delimited to where? The United States, excluding Minnesota, and it also includes Mexico. Not Alaska, continental 48 states. And so, sorry. I'm sorry, I lost the question. Well, it was back to whether you have to actually go through the exercise of saying what that is and what the impact on this is. As a factual matter, with the exception of Isle Royale, which has never been considered as part of the DPS population, none of the population of the other listing, the lower 47 listing, is impacted by this rule. That is a factual fact in this case, well supported, not really questioned. And it's also almost a necessary condition of being a DPS in the first place. If this population was intermingled with other wolf populations, such that if delisting would affect them, it probably wouldn't be a DPS in the first place. And if for some reason it was, it would be a very different case because you'd have a situation where this was affecting a different species, a different population. How do you respond to the suggestions in the record that there is some genetic exchange with the Rocky Mountain wolves across northern North Dakota? There's no record support for that having happened. There is a very well-established genetic exchange with the wolf population in Ontario and Saskatchewan, but we know of no meeting of the Western Great Lakes DPS and the Northern Rocky Mountain DPS. Except for Canada. I suppose it's possible, but it's mostly the wolves that are already in Canada, closer to the Western Great Lakes DPS that are probably the ones breeding. Is there no record because you didn't look? No, the wolves have been radio collared and tracked. I mean, that's how we know where they've gone. I mean, not every wolf is radio collared, so there could be some things we don't know about, but they've been very thoroughly studied and monitored. I did want to clarify that I did not intend to disavow the recovery plan. The recovery plan is very important. No, I didn't think you did. I was just talking about that as the reason why these areas have been focused about WS activity, even though the listing was nationwide plus a separate Minnesota listing. Just because that really seems to be an extraordinarily important benchmark. If you're saying, no, not nationwide, let's look at the populations that are thriving, it seems to me that what you're implicitly doing is saying that was our plan and that we succeeded. Right. As a factual matter in this case, the criteria of the recovery plan have been vastly exceeded. The goals were a stable population in Minnesota of 1,200 to 1,400. It was about 2,900 at the time of the listing, and then they needed a population of at least 100. If it's within 100 miles, that population is close to 1,400 in Wisconsin and Michigan. The goals of the recovery plan have been vastly exceeded, and the statute does say about recovery plans that they are to consist of objective measurable criteria, which when met would result in a determination in accordance with the provisions of Section 4 that the species be removed from the list. This is always what defines a recovered species. The situation in New Mexico is they're still endangered. It is a separate species in the sort of biological sense? It's a separate subspecies? That definitely is. That definitely is. Everything else, though, no. Gray wolves. Everywhere else. The controversy about subspecies is really limited to the western Great Lakes and to the eastern wolves. There's not an affirmative matter, a ground on which Fish and Wildlife is willing to go forward and say it's a separate species. It's a separate subspecies. Why are you not seeking delisting nationwide right now? It sounds like you think you can. They could, and they may. Why are you not doing that, though? Why this gymnastics to get new legal authority and DPSs for defining and delisting? It's obviously some difficulty in fitting it within the rubric of the Endangered Species Act and the common sense understanding of species and the notion that we should look at the big picture. I'm just trying to get a sense of why that's not what we're arguing about. Because the DPS authority should give them the authority to be able to manage it the way they're trying to manage it. And Mr. Henry suggested that there is ample flexibility, even if it's interpreted, so that you can't list a DPS that is not endangered or threatened. But that is simply not the case. It would not take this case. This population is recovered. It is viable. The definition of recovered, again, is not endangered. It is not endangered. So we couldn't divide the whole United States into DPSs and then find them endangered or threatened. But that just seems like a more reason to say, let's not get into dividing anything. Let's look at the picture. We've achieved, more than achieved, the aims of the original recovery plan. Look at the whole country and delist. Why not? In some cases, and I think in this case it would be very difficult, because you've got these different populations with different statuses. And in all of the other species that the Fish and Wildlife Service and the National Marine Fisheries Service have to manage, you might have, I mean, here we have three. There are some species with 12 different populations. And if they have to devote every time they want to recognize the recovery or the lack of recovery and the need to uplift one population, if they have to reexamine the entire species, that is a tremendous tying of their hands. It's a tremendous diversion of resources that keeps them from managing the species as Congress intended, as we can see from the 1973 legislative history, they intended to give the species, when they gave that authority to list a group of wildlife in common spatial arrangement, which evolved into the DPS language, they intended for Congress, for the Fish and Wildlife Service, to be able to list, delist, uplift, downlist the species with a more local sensitivity. So the problem with the previous statutes was it had to be listed everywhere, no matter how much local variation there was in the status of the species. There's just an on-off switch. And that is part of what the endangered, that is a problem that the endangered species fix by providing for different levels of species that can be listed. When you're protecting a species, however those definitions apply, and formulating plans, I assume you have to take into account the impact of what you're doing on one species under the ESA on, say, another endangered species that happens to be in the same area or neighboring area? I think it's a matter of fact they do. Whether they have to is a difficult statutory question because the five factors under Section 4A that have to be considered do not include impact on other species. Even other endangered ones, really? Yes. Now, having said that, I think they probably do, as a matter of fact. They don't have a position, though, on whether they can adopt a plan to revive one species that destroys another? If there is a position, I don't know it because it hasn't been an issue in this case, and therefore I'm not aware. You've never encountered anything like that? No. But in this case, as a factual matter, and almost necessarily as a legal matter because it's part of the definition of a DPS, this population is markedly separate from other populations of the same taxon in the United States, and therefore does not impact their recovery. And what's your best authority for your power to recognize DPS for purposes of free listing within a broader national endangerment finding? Well, the DPS policy itself, Section 4A.1 of the statute, the definition of species, and I would say Chevron, the agency on all of the statutory interpretation issues in these cases has put forth a formal agency interpretation subject to notice and comment interpreting the statutory language that courts have acknowledged is ambiguous, both in terms of significant portion of its range, and also the subcourt has held that it's ambiguous whether a DPS can be delisted. We don't think it's ambiguous. We think we unambiguously can. But if it's ambiguous, the service is put forward in a notice and comment rule making its interpretation. And so that is the authority for saying that it can, in addition to the documents it relied upon, of course, the DPS policy and the statute, which is ultimately the source of all authority here. The statute gives the service, the authority to make determinations whether a species is endangered or threatened. It has made that determination, and the fact that maybe it could be even more plentiful or even more widespread is not part of that determination. It is not endangered. It is not threatened. You didn't include any courts in your list of authorities. Well, Chevron. Yeah. There are two courts in the Ninth Circuit. One is Trout Unlimited versus Loan, and the other is Northwest Ecosystem Alliance versus something, and they are both cited in our brief, do uphold the services interpretation of the DPS authority, meaning that if it's discrete and it's significant, then it is a DPS, and then the determination of the conservation status is a separate next step. It's not part of what makes a DPS. It's just something you do with a DPS. All right. Thank you very much. Thank you very much. Mr. Gamble, we'll give you one minute if you need it. If you don't need it, you don't have to use it. Great. Thank you very much. That will not affect our judgment whatsoever, but Mr. Lister, we'll give you a minute if you need it. If you need it? Oh, that's yours. But one minute. I have a petition to recognize and delist the Western Great Lakes Distinct Population Segment. We are entitled to an answer, a yes or no answer. The service gave us that answer, and there are many interesting things we can debate as to what might be the optimal policy, but we believe we met the criteria for delisting, and therefore the service should be appointed. Great. Thank you very much. The case is submitted. Thank you.
judges: Griffith, Millett, Pillard